```
 1              UNITED STATES DISTRICT COURT
                 SOUTHERN DISTRICT OF IOWA
 2                   CENTRAL DIVISION

 3   WHITE COMMUNICATIONS,       )
     LIMITED LIABILITY           )
 4   COMPANY and JEFFREY N.      ) No. 4:18-cv-00124
     WHITE,                      )
 5                               )
     Plaintiffs/Counterclaim     ) DEPOSITION OF
 6   Defendants,                 )
                                 ) ERIC ATCHLEY
 7   vs.                         )
                                 )    ┌──────────────┐
 8   SYNERGIES3 TEC SERVICES,    )    │    COPY      │
     LLC,                        )    └──────────────┘
 9                               )
     Defendant/Counterclaimant.)
10   -------------------------)

11

12                THE DEPOSITION OF ERIC ATCHLEY,

13   taken before Janice M. Doud, Registered

14   Professional Reporter and Notary Public,

15   commencing at 3:10 p.m., on the 4th day of

16   June, 2019, at 700 Walnut Street, Suite 1600,

17   Des Moines, Iowa.

18

19

20

21

22

23       Reported by:  Janice M. Doud, R.P.R.

24                  ┌─────────────────┐
                    │    EXHIBIT      │
25                  │       B         │
                    └─────────────────┘
```

Page 46

1  night with them?
2      A.  No.
3      Q.  Was there an occasion, as you understood
4  it, that they were getting -- was there a reason
5  they were getting together that night?
6      A.  I think it was just happenstance that
7  they both stayed at the same hotel.
8      Q.  I'm sure I'm not remembering it very
9  clearly, but it sticks in my mind that in his
10  deposition earlier Mr. White said something
11  about -- or maybe it was even Mr. Collins.  I
12  think Mr. White said something about remembering
13  some sort of kind of early celebration
14  atmosphere to getting a deal put together with
15  Dynamic.
16          Would this have been some sort of
17  celebratory atmosphere that these guys were
18  engaged in that night?
19      A.  No, to my recollection the deal was not
20  done.  We had -- There were still some things to
21  iron out, and so it was still a critical time in
22  the deal.
23      Q.  In your mind, at that time was the
24  White Communications deal done?
25      A.  It was.

Page 47

1      Q.  What else had you learned about Jeff
2  White that called into question his standards of
3  behavior before you got this information from
4  AT&T about the Georgia situation?
5      A.  The only other instance was kind of
6  hearsay.  One of my managers -- It was something
7  about Bourbon Street and Jeff likes to throw it
8  down down there.  That's all I can recall.
9      Q.  Is there anybody that ever went to
10  Bourbon Street that didn't throw down when they
11  were there?
12      A.  I've been there, did not partake in
13  what goes on there, but there's -- there's a
14  level of spectating.  There's a level of a whole
15  other thing, and --
16      Q.  I took you to be referring to drinking,
17  but maybe you weren't.
18      A.  No, the women and drinking thing.
19      Q.  Okay.  Who was it that told you about
20  this?
21      A.  It was one of my managers, I believe.
22  It was somebody from Louisiana.  I could -- I
23  could look and get that name for you.
24      Q.  You don't remember right now?
25      A.  Yeah.  No.

Page 48

1      Q.  Okay.  And do you remember anything
2  more specific that he told you than what you
3  already told me?
4      A.  What that person told me?
5      Q.  Yes.
6      A.  No.  I didn't really have any reason to
7  kind of question, not until after the AT&T event.
8      Q.  Okay.  Tell me when it was that Jeff
9  White told you that he had intended to be sending
10  that message to somebody else.
11      A.  I downloaded it.  I keep everything;
12  and, unlike him, I copied every text message, so
13  there -- We had a lot of text messages back and
14  forth.  I'm sure either you will get it or you
15  have it.
16          This was a phone call.  I think
17  he felt like he was going to get a sympathetic
18  Eric because I'm a pretty sympathetic person.
19  I'm the only one that advocated for that
20  particular deal.
21          And he specifically told me,
22  "Eric," because we were constantly in
23  communication with him, "Hey, did you get any
24  information from U.S. Cellular?  Did you get
25  any information?"  Because, again, this was

Page 49

1  going to end our business, 100 percent.  I don't
2  give a shit what anybody thinks.  It was going
3  to end our business if this -- if they connected
4  Mr. White to Synergies3.
5      Q.  What do you mean you don't give a shit
6  about what anybody thinks?
7      A.  Well, everybody is going to have an
8  opinion here.  The jury is going to have an
9  opinion.  In my opinion, right, the act was so
10  egregious, and I've worked with these companies
11  long enough to know that an act like that, that
12  would have potential litigation behind it, right,
13  which might be the reason why he was notified
14  four months later, don't know, my opinion, that
15  normally the recourse is immediate.  They'll
16  fire your ass and then ask questions later.
17      Q.  "Fire" meaning fire --
18      A.  Fire the entire company.
19      Q.  Fire Synergies in this case?
20      A.  Yes.  Yeah, I've heard rumors that
21  other companies, for any reason, not a
22  sexual-related act, but for doing a poor job on
23  an installation, doing a poor job at a senator's
24  house.
25      Q.  Sexual harassment of an employee?

Page 50

1    A.    Absolutely.  Anything egregious like
2 that.  I've seen it for less than what he did,
3 and I've seen it for -- That one I've never
4 heard of.  That one was strange.
5    Q.    Can you tell me the names of companies
6 that have lost their contract with DirecTV or
7 AT&T because of something like that?
8    A.    I could probably get that to you.  Jeff
9 referred to there was about 100 companies at the
10 time.  When me and Jeff did the deal, there was
11 only about 60 left.
12          Companies were often getting
13 fired for quality reasons, for what a technician
14 did, sometimes an owner.  I know of one specific
15 situation where an owner walked into a DirecTV
16 office smelling like weed, immediate termination.
17 The company was AAI.
18          I don't recall anything down the
19 lines of what he did.  I do recall, not names,
20 where a specific technician will engage in a
21 text message with a customer; and that always
22 leads to immediate termination of that
23 technician.
24    Q.    Of the technician?
25    A.    Yes.

Page 51

1    Q.    Okay.
2    A.    It's basic ethics.
3    Q.    What is?
4    A.    The -- I mean, every company has a code
5 of ethics, and I'm sure AT&T has one.  It's
6 probably right there.  It's probably public.
7    Q.    What is?
8    A.    Their ethics, their code of ethics.
9    Q.    I think we can all agree that most
10 companies would have a code of ethics that would
11 say you shouldn't send a text like that to a
12 customer, if that's what you're telling me.
13    A.    Yes.
14    Q.    Okay.  You're telling me, though, also,
15 that -- and I realize you don't know names right
16 now, names of companies, but that it would have
17 been certainly not at all unheard of for a
18 company to simply lose its entire contract with
19 DirecTV and AT&T because of an incident like
20 that or maybe an incident more mild than that;
21 is that right?
22    A.    Yes, sir.
23    Q.    And that happens regardless of whether
24 the company says, "Hey, we didn't even know
25 about it.  It wasn't our fault"; is that right?

Page 52

1    A.    Yes, sir.
2    Q.    Why didn't AT&T get rid of Synergies3
3 then?
4    A.    Because it took them four hours to
5 figure out Jeff White and White Communications --
6 They had not put it together that Jeff was a
7 part or a member of Synergies3.  At that moment
8 that that security person made the determination,
9 100 percent.
10    Q.    But they knew four hours later, though.
11    A.    Well, they knew four -- Kristin Goss
12 knew four hours later because she had heard that
13 Jeff White and -- or White Communications and
14 Synergies merged, and that's why she reached out
15 to Roger, that worked for us at the time, and
16 basically told us, "Hey, this is about as
17 serious as it gets."
18    Q.    So why didn't they get rid of you?
19    A.    That I do not know, and I did not ask.
20 It's not something you ask.
21    Q.    It sounds like not getting rid of you is
22 inconsistent with what you would have expected.
23    A.    Well, there was some gray area there.
24 Jeff White, they thought he was -- White
25 Communications was still a business because they

Page 53

1 were on one lateral, retail.  White Communications
2 was no more fulfillment.  White Communications
3 continued to operate.
4          They were trying to find him
5 somewhere in the system.  AT&T had just bought
6 DirecTV, so there was some confusion.  Right?
7 So thank the grace of God they didn't tie him to
8 me at that time, but I did not know they had not
9 tied him to me.
10    Q.    You sure knew it by October 31st.
11    A.    No, I did not.
12    Q.    Okay.
13    A.    Because all it would take was for
14 litigation from that customer and we would all
15 be gone.
16    Q.    So do you think that -- You've seen the
17 e-mail.  Let's just look at it.  If I can find
18 it, I'm going to hand you Exhibit 7.  There it
19 is.
20          In Exhibit 7, as of October
21 20th -- I'm starting on page 2 at the very
22 bottom and going over to page 3.
23    A.    Okay.
24    Q.    Whoever Sean Stewart is, is sending an
25 e-mail to somebody at AT&T named Andy Hendrix on

Page 54

1  October 20 in which he says, among other things,
2  that Mr. White or White Communications, a DTV
3  vendor, did this; right?
4      A.  Yes.
5      Q.  And then on the same day doesn't the
6  same man send another e-mail that says, "This
7  appears to be a contractor that works for IEFS
8  and is not associated with MasTec"; correct?
9      A.  That's what it says, yes.
10     Q.  What is IEFS, if you know?
11     A.  That is the -- Something entertainment
12 field services.  That's an AT&T acronym for the
13 division that we operate.  All television -- Just
14 think all television, IEFS.
15     Q.  All right.  And MasTec, do you know
16 what that stands for?
17     A.  It's a Spanish word for MorTec.  It's
18 another company.
19     Q.  Oh, okay.  So not part of AT&T?
20     A.  No.  They're a publicly traded company.
21     Q.  So, if you know, did somebody have the
22 idea that Jeff might have been associated with
23 MasTec?
24     A.  I assume that's when they were trying
25 to hunt him down.  They -- Because the chain of

Page 55

1  events actually starts on the very last page or
2  on page 3.
3      Q.  Yeah.  Right.  I thought that's where
4  we were.
5      A.  I guess ask your question.
6      Q.  Okay.  Then at the top of page 2, still
7  October 20, doesn't Kristin Goss send an e-mail
8  to Mr. Hope?  That's Roger Hope; right?
9      A.  Uh-huh.
10     Q.  Well, obviously, to your company about
11 this situation.  So she knows that Jeff White is
12 affiliated somehow with Synergies; correct?
13     A.  No.
14     Q.  Why was she sending you an e-mail?
15     A.  Because --
16     Q.  Or sending Mr. Hope an e-mail?
17     A.  To the best of my knowledge, Roger Hope
18 and Kristin Goss worked in the same department.
19 Right?  Sean Stewart is an HSP manager.  He was
20 sent this from Andy Hendrix, which is in the
21 security department.
22     Q.  At AT&T?
23     A.  Yes.  He sent it to Sean, assuming Sean
24 would know who this individual was.
25     Q.  Right.

Page 56

1      A.  When Sean replied back to Andy this
2  guy -- because Sean manages and oversees MasTec
3  operations for AT&T.  Sean then copied -- Well,
4  he cc'd Kristin Goss, which is a local area
5  manager for the Atlanta, Georgia area, so then
6  she -- she recognized -- because Kristin Goss --
7  Jeff White and White Communications used to work
8  for her, so he's probably had many conversations
9  with her.  So when she recognized the name, she
10 then maybe put two and two together, but she did
11 not -- she probably did not know Jeff White and
12 White Communications was situated with Synergies.
13 She had sent it to the only person she thought
14 might probably would know, which was Roger Hope.
15     Q.  What could possibly have made her think
16 to send it to Synergies unless she thought Jeff
17 was affiliated with them?
18     A.  Because Jeff White and White
19 Communications used to do a lot of work for
20 Mr. Hope in the Iowa area.  Jeff White and White
21 Communications was -- had good relations with
22 Mr. Hope, and Mrs. Goss probably knew that.
23     Q.  So do you think AT&T never learned
24 that -- Other than -- Well, do you think nobody
25 at DirecTV or AT&T ever learned that Jeff White

Page 57

1  was affiliated somehow with Synergies?
2      A.  No, to my opinion, I do believe that
3  somebody learned about it and they were waiting
4  on what our actions were going to be.
5      Q.  Okay.  Tell me about the basis for that
6  opinion that somebody learned about it.
7      A.  Just my business opinion.
8      Q.  Have you ever seen any documents that
9  support it?
10     A.  I don't ask for my client to -- I don't
11 wait for my client to fire me before I know what
12 pretty much needs to be done.
13         MR. GRAHAM:  Would you mind
14 reading the question back for the witness,
15 please?
16         (Requested portion of the record
17         was read.)
18     A.  Documents to support what?
19     Q.  Your belief that AT&T eventually found
20 out that Jeff White was affiliated with Synergies.
21     A.  I have not seen any documents, no.
22     Q.  Have you talked to anybody who told you
23 that AT&T or DirecTV ever figured out that Jeff
24 White was affiliated with Synergies?
25     A.  I do believe Mr. Sellers figured it

Page 58

1   out.
2      Q.   And why do you say that?  What do you
3   base that on?
4      A.   Because Lee Branning, I believe, had a
5   conversation with Mr. Sellers.  I can't speak to
6   that, and -- but I imagine it was not pleasant;
7   but he did know because he was overseeing the
8   consolidation of 60 companies down to two or
9   three, so there was a lot of action going on in
10  the marketplace.
11     Q.   Sellers was overseeing; right?
12     A.   Yes.  He's the man.
13     Q.   Yeah.  Okay.
14          And this conversation that you
15  think Branning had with Mr. Sellers, you know
16  about that because Branning told you about it?
17     A.   Yes.
18     Q.   Okay.  Tell me what you remember
19  Mr. Branning telling you about that
20  conversation.
21     A.   To the best of my knowledge, it was
22  about as serious as it can be.  And, of course,
23  an AT&T person of that stature, you know, we
24  didn't specifically ask.  I don't even know what
25  Lee asked, but I could wonder if Lee would have

Page 59

1   asked, "Hey, are we done?  What have we got to
2   do?  What's the deal?"
3          And I don't know what -- and I do
4   not recall what answer he got, other than we had
5   to imply that something had to be done.  But
6   there was no ever paperwork and probably not a
7   definitive, "Hey, you must remove him or we're
8   going to fire you."  I don't think any company
9   on the planet earth would say that, but there
10  could be.
11     Q.   How about --
12     A.   You could depose him and ask him.
13     Q.   You can count on it.
14     A.   Okay.
15     Q.   But based on your experience, you also
16  would have expected at that point that AT&T
17  would have just said, "Synergies, you guys are
18  out"?
19     A.   Well, given the circumstances, it was
20  gray, to my knowledge.
21     Q.   What was gray about it?
22     A.   That it was a -- When people originally
23  looked, the customer, the alleged customer, was
24  installed.  So standard practice is when you
25  have a customer claiming or sent Office of the

Page 60

1   President, standard practice is for anybody
2   researching that job to pull up who installed
3   it, which company installed it.  It was White
4   Communications.
5          And then, of course, here's the
6   owner of that company is the one committing the
7   act.  Right?  So that's the confusion, to answer
8   your question, is that the job was not done
9   under Synergies; but Mr. White, in that small
10  amount of time, became an owner of Synergies.
11     Q.   Do you have an understanding of when
12  this text message with this customer actually
13  happened?
14     A.   I do remember, it's hearsay, that Jeff
15  White was upset with this customer.
16     Q.   I'm going to cut you off.  My question
17  was a little bit vague.  And it's not that I
18  don't want to hear what you have to say about
19  that, but what I mean is at what point in time.
20  Do you have what date or approximate date it
21  happened?
22     A.   An approximate would be within two
23  weeks of this e-mail coming to Roger and then to
24  myself.
25     Q.   So within the two weeks before April

Page 61

1   20th?
2      A.   I do recall --
3      Q.   I mean October 20th.
4      A.   Yeah, I do recall him working a damage
5   claim and him not being happy with what the
6   customer was telling him.
7      Q.   And do you now think that was this same
8   person, or do you know?
9      A.   Yes, because Jeff White generally did
10  not deal with, from what I was told, because he
11  had a damage claim guy.  This one, why he took
12  the need to even -- In our business, texting
13  customers is by far the dumbest thing you could
14  possibly do ever.  It just is.
15     Q.   Why?
16     A.   Because it's -- You could send
17  something you don't want to do.  I mean, half
18  that text message was argumentative.  I don't
19  know if you see that; but I'm sure a customer in
20  any way, you know, take it or leave it, kind of
21  answering, I mean, just pretty basic to me.
22     Q.   Is it also a dumb thing to do because
23  customers could --
24     A.   That's enough to be fired for right
25  there, before you get down to the bottom.

Page 102

```
1              CORRECTION/CHANGE SHEET
2              I have read the entire transcript of
   my deposition taken on the 4th day of June,
3  2019, or the same has been read to me.  I
   request that the following changes be entered
4  upon the record for the reasons indicated.  I
   have signed my name to the signature page and
5  authorize you to attach the same to the original
   transcript.
6
   Page   Line   Correction or change and reason
7                 therefor
8  ___  ___  _____
9  ___  ___  _____
10 ___  ___  _____
11 ___  ___  _____
12  ___  ___  _____  _
13 ___  ___  _____
14 ___  ___  _____
15 ___  ___  _____
16 ___  ___  _____
17 ___  ___  _____
18 ___  ___  _____
19 ___  ___  _____
20 ___  ___  _____
21 ___  ___  _____
22 ___  ___  _____
23 Date _____ Signature _____
24
25
```

Page 103

```
1              C E R T I F I C A T E
2
3              I, the undersigned, a Registered
   Professional Reporter and Notary Public, do
4  hereby certify that I acted as the Registered
   Professional Reporter in the foregoing matter at
5  the time and place indicated herein; that I took
   in shorthand the proceedings had at said time
6  and place; that said shorthand notes were
   reduced to typewriting under my supervision and
7  direction, and that the foregoing pages are a
   full and correct transcript of the shorthand
8  notes so taken; that said deposition was
   submitted to the witness for signature as
9  requested and that any changes, if any,
   requested by the witness are attached hereto.
10
               I further certify that I am
11 neither attorney nor counsel for, or related to
   or employed by any of the parties in the
12 foregoing matter, and further that I am not a
   relative or employee of any attorney or counsel
13 employed by the parties hereto, or financially
   interested in the action.
14
               IN WITNESS WHEREOF, I have hereunto
15 set my hand and seal this 11th day of June, 2019.
16
17
               _____
18             REGISTERED PROFESSIONAL REPORTER
               and NOTARY PUBLIC
19
20
21
22
23
24
25
```