Page 1

```
 1              UNITED STATES DISTRICT COURT
                 SOUTHERN DISTRICT OF IOWA
 2                    CENTRAL DIVISION

 3   WHITE COMMUNICATIONS,      )
     LIMITED LIABILITY          )
 4   COMPANY and JEFFREY N.     ) No. 4:18-cv-00124
     WHITE,                     )
 5                              )
     Plaintiffs/Counterclaim    ) DEPOSITION OF
 6   Defendants,                )
                                ) ERIC ATCHLEY
 7   vs.                        )
                                )
 8   SYNERGIES3 TEC SERVICES,   )        COPY
     LLC,                       )
 9                              )
     Defendant/Counterclaimant. )
10   ---------------------------)

11

12              THE DEPOSITION OF ERIC ATCHLEY,

13   taken before Janice M. Doud, Registered

14   Professional Reporter and Notary Public,

15   commencing at 3:10 p.m., on the 4th day of

16   June, 2019, at 700 Walnut Street, Suite 1600,

17   Des Moines, Iowa.

18

19

20

21

22

23       Reported by:  Janice M. Doud, R.P.R.

24

25
```

EXHIBIT F

Page 38

1  out, but that wasn't what I asked you.  I asked
2  you whether there was a lot of money at stake.
3       A.   I guess that's relative to who's
4  asking.
5       Q.   All right.
6       A.   But, yes, if that's a lot of money to
7  you, that's a lot of money, yes.
8       Q.   It comes up to several million dollars.
9  That is a lot of money to me.  Is that not a lot
10 of money to you?
11      A.   It is a lot of money.
12      Q.   To you?
13      A.   No, to everybody.  It was a lot of
14 money to him.
15      Q.   Yeah.
16      A.   It's a lot of money that didn't have to
17 be paid, but we did.
18      Q.   Now I want to go back to you saying you
19 can't make this up, that it was awful what he
20 did.
21           Did you believe he had intended
22 to send that text message to that woman in
23 Georgia?
24      A.   I have no idea what he had intentions
25 to do.

Page 39

1       Q.   Did you ever have any idea?
2       A.   I think after we did our merger with
3  Mr. White, more about his indiscretions, his
4  personal indiscretions, with the two
5  individuals, as my attorney asked Mr. White
6  earlier about an event that happened, so it is
7  absolutely in Jeff White's character to talk to
8  women and text them that way.
9            I did not know that before we
10 commenced our deal, but I know now.  And so when
11 this situation happened and then when Jeff
12 finally acknowledged the fact that he did, it
13 just was supposed to go to the other person, I
14 don't know whether I believe him or not.
15      Q.   But are you saying that by the time you
16 learned of this claim that the woman in Georgia
17 was making -- By "claim" I mean the claim that
18 the text was sent.
19      A.   Yes.
20      Q.   By the time you learned of that, you
21 had learned enough about Jeff White that it
22 seemed plausible to you.  Is that a fair
23 summary?
24      A.   Well, a potential business that we were
25 courting, Dynamic Installations, right, they --

Page 40

1  we had not commenced the deal with them, called
2  me later on that night or the next day and was,
3  like, Jeff White went to the hotel door guy or
4  the guy that checks people in, gave him some
5  money and told him to call some girls over.
6  Now, I don't know what that means, but to me
7  that's -- that's not what normal business owners
8  do.
9       Q.   I'm going to come back to that.
10      A.   Okay.
11      Q.   But I do want you to answer my
12 question.  And I think I know the answer, but
13 let's be sure.
14           Are you saying that by the time
15 you learned of the allegation that the woman in
16 Georgia was making and that went to the
17 president of AT&T, by the time you learned of
18 that, you believe you had learned things about
19 Jeff White that made you think that that could
20 have happened?  Is that a fair statement?
21      A.   I believe that's fair, yeah.
22      Q.   Okay.  Now, I think you're telling me
23 that one of the things that you had learned
24 about Jeff White was what one or more of these
25 people from Dynamic told you about talking to

Page 41

1  the doorman about getting some women; right?
2       A.   Yes.  That was -- that was potentially
3  to screw up the -- the acquisition of that
4  company.  He almost did that.
5       Q.   Do you think he did that for that
6  purpose?
7       A.   I don't know what somebody else goes --
8  goes on in their brain, but that --
9       Q.   Do you really think he would have done
10 it for the purpose of screwing up the deal?
11      A.   I don't know why anybody would text a
12 woman that, especially when he's a married man.
13      Q.   No, no, no.  You're not claiming that
14 the text happened when the people from Dynamic
15 were around, are you?
16      A.   No.
17      Q.   Okay.  That's what I'm talking about,
18 the doorman and asking to send women over.  Are
19 we on the same page now?
20      A.   Do I really think that he --
21      Q.   Did that in order to screw up the deal
22 with Dynamic.
23      A.   I don't know.
24      Q.   You really don't.  Okay.
25      A.   No.  I mean, it's -- it's -- we're

Page 42

1  dealing with some pretty weird shit here.
2      Q.   Tell me, then, more about that.  What
3  was the weird shit that was happening as you
4  understood it from what the Dynamic people told
5  you.
6      A.   Well, when that happened, right, I
7  chalked that away as maybe the guy's got a
8  problem.
9      Q.   Just a minute.  I'm not asking -- I'm
10 sorry to interrupt.
11     A.   Okay.
12     Q.   But I'm not asking you how you reacted
13 right now.
14     A.   Okay.
15     Q.   I want to know what you understood had
16 happened that night.  I assume it was a night.
17          MR. COLLINS:  I'm going to object.
18 That's been asked and answered about four times.
19 Go ahead and tell him about it.
20     Q.   So you've told me -- That may be right.
21 Have you told me everything that you know about
22 what happened?
23     A.   Do I know if he had sexual intercourse
24 with hookers?  I don't know.
25     Q.   I'll decide if I want to ask that

Page 43

1  question.
2      A.   Okay.
3      Q.   My question is, have you told me
4  everything you know about what happened that
5  night that the Dynamic people reported to you?
6      A.   I don't know.  I've never -- We didn't
7  really have a lengthy discussion with -- I did
8  not have a lengthy discussion.  I thought it was
9  pretty damn embarrassing to have a conversation
10 like that, to have a -- I considered Jeff a
11 member of my company; and then when he acts like
12 a fool in front of two potential members,
13 possibly members of the company, I thought that
14 was pretty egregious in any form.
15     Q.   I'm sorry.  I'm not being real clear.
16 I want to know whether you've told me everything
17 you know about --
18     A.   If I went and asked Jason Smith --
19     Q.   I want you to let me finish my
20 question.
21     A.   Okay.
22     Q.   I want to know whether you have now
23 told me everything you know about what happened
24 that night or what might have happened that
25 night?

Page 44

1      A.   For everything that I do know today, I
2  have told you everything.  Is there more?  I
3  don't know.
4      Q.   We'd have to ask somebody else?
5      A.   You have to ask Jason, yes.
6      Q.   Okay.  And was Jason the person that
7  informed you about this?
8      A.   Yes, sir.
9      Q.   Okay.  And was it you, I can't
10 remember, that he told or was it Ben or somebody
11 else?
12     A.   Jason told myself.  He called me.  I
13 can't remember if it was that night or the next
14 day.
15     Q.   And what was his tone?  In other words,
16 was he upset?  Was he laughing about it?  Was he
17 shocked?  Tell me how you perceived that.
18     A.   To be honest with you, he said he didn't
19 even know how to respond to that.  He -- I guess
20 he was still digesting it.  He just thought that
21 this guy was -- was out there.
22     Q.   Did he say that he had been offended by
23 it?
24     A.   Implied, I guess.
25     Q.   Maybe didn't use those words?

Page 45

1      A.   Well, he's a married man, too, so I
2  guess it would be -- you know, nobody wants to
3  be caught up into that stuff.
4      Q.   Marriage is, in your mind, an important
5  thing?
6      A.   I would believe so, yes, sir.
7      Q.   To be loyal to your spouse?
8      A.   Yes, sir.
9      Q.   Did you ever -- What is Jason's last
10 name?
11     A.   Smith.
12     Q.   Smith.  Was Mr. Demet -- Is it Demet?
13 Was he there, also, as you understood it?
14     A.   I believe so, yes.
15     Q.   Did you ever hear anything from him
16 about it?
17     A.   Not directly, no.
18     Q.   How about indirectly?
19     A.   Jason said Jon was -- I don't want to
20 speculate, but they were -- I was not there.  So
21 they were all -- It all happened -- I remember
22 something about an ATM and something about a --
23 the check-in guy, and that was it.  I didn't
24 really dig in.
25     Q.   Okay.  Had you been there earlier that

Page 46

1  night with them?
2     A.  No.
3     Q.  Was there an occasion, as you understood
4  it, that they were getting -- was there a reason
5  they were getting together that night?
6     A.  I think it was just happenstance that
7  they both stayed at the same hotel.
8     Q.  I'm sure I'm not remembering it very
9  clearly, but it sticks in my mind that in his
10 deposition earlier Mr. White said something
11 about -- or maybe it was even Mr. Collins.  I
12 think Mr. White said something about remembering
13 some sort of kind of early celebration
14 atmosphere to getting a deal put together with
15 Dynamic.
16         Would this have been some sort of
17 celebratory atmosphere that these guys were
18 engaged in that night?
19    A.  No, to my recollection the deal was not
20 done.  We had -- There were still some things to
21 iron out, and so it was still a critical time in
22 the deal.
23    Q.  In your mind, at that time was the
24 White Communications deal done?
25    A.  It was.

Page 47

1     Q.  What else had you learned about Jeff
2  White that called into question his standards of
3  behavior before you got this information from
4  AT&T about the Georgia situation?
5     A.  The only other instance was kind of
6  hearsay.  One of my managers -- It was something
7  about Bourbon Street and Jeff likes to throw it
8  down down there.  That's all I can recall.
9     Q.  Is there anybody that ever went to
10 Bourbon Street that didn't throw down when they
11 were there?
12    A.  I've been there, did not partake in
13 what goes on there, but there's -- there's a
14 level of spectating.  There's a level of a whole
15 other thing, and --
16    Q.  I took you to be referring to drinking,
17 but maybe you weren't.
18    A.  No, the women and drinking thing.
19    Q.  Okay.  Who was it that told you about
20 this?
21    A.  It was one of my managers, I believe.
22 It was somebody from Louisiana.  I could -- I
23 could look and get that name for you.
24    Q.  You don't remember right now?
25    A.  Yeah.  No.

Page 48

1     Q.  Okay.  And do you remember anything
2  more specific that he told you than what you
3  already told me?
4     A.  What that person told me?
5     Q.  Yes.
6     A.  No.  I didn't really have any reason to
7  kind of question, not until after the AT&T event.
8     Q.  Okay.  Tell me when it was that Jeff
9  White told you that he had intended to be sending
10 that message to somebody else.
11    A.  I downloaded it.  I keep everything;
12 and, unlike him, I copied every text message, so
13 there -- We had a lot of text messages back and
14 forth.  I'm sure either you will get it or you
15 have it.
16         This was a phone call.  I think
17 he felt like he was going to get a sympathetic
18 Eric because I'm a pretty sympathetic person.
19 I'm the only one that advocated for that
20 particular deal.
21         And he specifically told me,
22 "Eric," because we were constantly in
23 communication with him, "Hey, did you get any
24 information from U.S. Cellular?  Did you get
25 any information?"  Because, again, this was

Page 49

1  going to end our business, 100 percent.  I don't
2  give a shit what anybody thinks.  It was going
3  to end our business if this -- if they connected
4  Mr. White to Synergies3.
5     Q.  What do you mean you don't give a shit
6  about what anybody thinks?
7     A.  Well, everybody is going to have an
8  opinion here.  The jury is going to have an
9  opinion.  In my opinion, right, the act was so
10 egregious, and I've worked with these companies
11 long enough to know that an act like that, that
12 would have potential litigation behind it, right,
13 which might be the reason why he was notified
14 four months later, don't know, my opinion, that
15 normally the recourse is immediate.  They'll
16 fire your ass and then ask questions later.
17    Q.  "Fire" meaning fire --
18    A.  Fire the entire company.
19    Q.  Fire Synergies in this case?
20    A.  Yes.  Yeah, I've heard rumors that
21 other companies, for any reason, not a
22 sexual-related act, but for doing a poor job on
23 an installation, doing a poor job at a senator's
24 house.
25    Q.  Sexual harassment of an employee?

Page 74

1  A.  Yes.  The original e-mail that came
2  from Kristin Goss to Roger had this attached to
3  it.
4  Q.  Okay.  So that would have come -- the
5  attachment would have come electronically?
6  A.  With this e-mail here.
7  Q.  Got it.  Okay.
8      Do you know -- You probably don't,
9  but I better ask you.  Do you know whether what
10 Kristin Goss had was a piece of paper that she
11 scanned in or did she receive it electronically?
12 A.  I have no idea.
13 Q.  Okay.  You've told me that -- I'm
14 paraphrasing, but I think you're saying the
15 reasons that you now believe Jeff actually sent
16 the text are, one, he said he did.
17 A.  Yes.
18 Q.  Two, you heard about an incident that
19 supposedly happened in front of the Dynamic
20 people where he talked about getting some women.
21 And was there a third one?
22 A.  New Orleans, Bourbon Street.
23 Q.  And the New Orleans Bourbon Street
24 comment you told me about.
25      Anything else that makes you

Page 75

1  think he actually did it?  And I realize him
2  telling you that is a big part.
3  A.  Now, are we still pre?
4  Q.  Well, no, now.  How about right now?
5  A.  So if you're asking the question so
6  when we got dealt this, right, it was a -- we
7  didn't know how to handle it.  Right?  We,
8  myself and Ben, really needed to -- we asked
9  ourselves, man, is this -- could he have done
10 this.  Right?
11     So we're sitting here thinking.
12 You know, it recalls my memory of what Jason
13 said, recalls my memory of what happened from
14 what I heard on Bourbon Street.
15     I called a few people.  I called
16 Jerry Newsom, which he called his right-hand
17 man, and he basically laid it out to me that
18 this is -- this is just the kind of man he is,
19 this is just what he does, just about every
20 facility he goes to, something of this sort, the
21 websites and stuff, the women.  I don't know.
22 Q.  And was that conversation --
23 A.  After.
24 Q.  It was after October 30th?
25 A.  Yes.  Well, take that back.  Was it

Page 76

1  after October 30th?  It was after I was sent
2  this.
3  Q.  Yeah.  It was after October 20th.
4  A.  Yes.
5  Q.  Okay.  But maybe before your October
6  30th meeting or 31st, whichever it was?
7  A.  It could have been.
8  Q.  Okay.  I guess the 31st.
9      And that conversation with Newsom,
10 did you say it was on the phone?
11 A.  Yes.
12 Q.  Have you told me everything you remember
13 him telling you about Jeff in that call?
14 A.  Everything that I can remember, yes.
15 Q.  Yeah.  Okay.  Did you take notes of that
16 call?
17 A.  No.
18 Q.  By the way, you have emphasized that
19 you basically don't get rid of texts and phone
20 records, and I take it e-mails would be the same
21 thing.  You keep them; is that right?
22 A.  I believe I have every e-mail.  Me and
23 Jeff never really corresponded by e-mail, but I
24 think we had a few, and we -- I think we have
25 that.

Page 77

1      Jeff had sent many text messages
2  to me, so I have -- I have every text message
3  going back from -- I mean, it takes an effort to
4  remove them.  Just because you break a phone
5  doesn't -- they don't go away.
6  Q.  Okay.
7  A.  They're always there.
8  Q.  Okay.  Did you keep handwritten notes,
9  you know, of things related to White Communications
10 or Jeff White?
11 A.  I did keep one handwritten note that I
12 had.  I think we -- I think my attorney has it,
13 the $10,880, how that came to be.
14 Q.  Okay.  I don't think I've seen that,
15 but I will.
16     Okay.  Any other handwritten
17 note, as you sit here today, that you remember?
18 A.  No.
19 Q.  Okay.  So you told me that you talked
20 with Newsom.  What else do you remember as you
21 sit here today that would support your belief
22 that Jeff actually did this?
23 A.  Well, I didn't need any other proof
24 other than when he told me.
25 Q.  Yeah, I understand.

Page 102

```
 1              CORRECTION/CHANGE SHEET
 2         I have read the entire transcript of
   my deposition taken on the 4th day of June,
 3 2019, or the same has been read to me.  I
   request that the following changes be entered
 4 upon the record for the reasons indicated.  I
   have signed my name to the signature page and
 5 authorize you to attach the same to the original
   transcript.
 6
   Page   Line   Correction or change and reason
 7              therefor
 8  ___    ___   _____
 9  ___    ___   _____
10  ___    ___   _____
11  ___    ___   _____
12  ___    ___   _____
13  ___    ___   _____
14  ___    ___   _____
15  ___    ___   _____
16  ___    ___   _____
17  ___    ___   _____
18  ___    ___   _____
19  ___    ___   _____
20  ___    ___   _____
21  ___    ___   _____
22  ___    ___   _____
23 Date _____  Signature _____
24
25
```

Page 103

```
 1              C E R T I F I C A T E
 2
 3         I, the undersigned, a Registered
   Professional Reporter and Notary Public, do
 4 hereby certify that I acted as the Registered
   Professional Reporter in the foregoing matter at
 5 the time and place indicated herein; that I took
   in shorthand the proceedings had at said time
 6 and place; that said shorthand notes were
   reduced to typewriting under my supervision and
 7 direction, and that the foregoing pages are a
   full and correct transcript of the shorthand
 8 notes so taken; that said deposition was
   submitted to the witness for signature as
 9 requested and that any changes, if any,
   requested by the witness are attached hereto.
10
           I further certify that I am
11 neither attorney nor counsel for, or related to
   or employed by any of the parties in the
12 foregoing matter, and further that I am not a
   relative or employee of any attorney or counsel
13 employed by the parties hereto, or financially
   interested in the action.
14
           IN WITNESS WHEREOF, I have hereunto
15 set my hand and seal this 11th day of June, 2019.
16
17     _____
18     REGISTERED PROFESSIONAL REPORTER
       and NOTARY PUBLIC
19
20
21
22
23
24
25
```

Huney-Vaughn Court Reporters, Ltd.
515-288-4910